**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

UNITED STATES OF AMERICA          :

vs.                                                          : CRIMINAL NO. 09-MJ-0009-C
                                                                VIOLATION NOS. W0787748
                                                            : & W0787750
VAN COLLINS, III.

IN RE: CENTRAL VIOLATIONS BUREAU

**MEMORANDUM OPINION AND ORDER**

This misdemeanor dove hunting case came on for a bench trial before the undersigned on January 30, 2009 in Selma, Alabama (Doc. 4), following a waiver of the defendant's right to trial by a district judge pursuant to 18 U.S.C. § 3401(b). *See United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000) ("[W]e find that Chavez was not entitled to a jury trial because the offense with which he was charged is presumptively petty and its additional penalties are not so serious that they reflect Congress' determination that the offense is severe."). Upon a comprehensive consideration of the testimony and exhibits, as well as the parties' post-trial briefs (Docs. 11-13), the Court finds the defendant **NOT GUILTY** of the misdemeanors set forth in the violation notices. *Cf. United States v. Morgan*, 311 F.3d 611, 612 (5th Cir. 2002)

(possessing migratory game birds exceeding the daily bag limit, in violation of 16 U.S.C. § 703, is a misdemeanor charge); *United States v. Abbate*, 439 F.Supp.2d 625, 626 (E.D. La. 2006) ("[T]he United States charged appellant in a one-count bill of information with a misdemeanor, violations of 16 U.S.C. § 703 and 50 C.F.R. § 20.23, for taking or attempting to take wood ducks after legal shooting hours."); *United States v. Strassweg*, 337 F.Supp.2d 956, 957 (W.D. Ky. 2004) ("This Class B misdemeanor dove hunting case came before the undersigned United States Magistrate Judge for a bench trial on February 23, 2004[.] . . . Essentially, the Superceding Information charges that on or about September 1, 2002, defendants Jack Strassweg [] and Rick Krohn [] were hunting migratory birds (doves) over what they knew or should have known was a baited area, in violation of the Migratory Bird Treaty Act, and that defendant Clifford Romain [] aided and abetted them in committing the offense."), *aff'd*, 143 Fed.Appx. 665 (6th Cir. 2005), *cert. denied*, 546 U.S. 1174, 126 S.Ct. 1341, 164 L.Ed.2d 55 (2006).

## FINDINGS OF FACT

1.      On September 16, 2008, while on routine patrol, Mike Nelson, a conservation officer with the State of Alabama, observed a small crop of standing corn in a field located west of Thomaston in Marengo County,

Alabama. (T.T. 15 & 17) Nelson made a mental note to go back by the field for a closer look since it appeared to be a wildlife field, as it was not big enough for harvest. (*Id*. at 17) Nelson returned to the field on September 22, 2008; the officer observed several rows of corn, some of which had been bush-hogged, and two disced areas adjacent to the corn. (*Id*. at 18) According to Nelson, on top of the freshly disced ground there was top sown wheat. (*Id*.) Nelson took a sample of the wheat (Government's Exhibit 21) and left the field. (T.T. 18)

    2.    Nelson and his partner, Officer Joe Little, returned to the field the following night for the express purpose of putting some plots down to determine if a second application of wheat might take place. (*Id*. at 18-19) Nelson observed that the field appeared as it had the night before and that it was a legal field. (*Id*. at 19; *see also id.* at 22 ("[I]t appeared to be a legal field. I saw some corn manipulation and I saw freshly top-sewed wheat within the recommended planting date.")) Again, it was Nelson's impression that the wheat seed he observed on the ground was fresh because it was yellow-golden in color and there were no wheat (or seed) heads. (*Id*. at 20)[1] Nelson and Little

---

[1] Nelson did not believe that the wheat on the field came to be there because of manipulation of existing wheat. (*See id*. ("[A]ny time you manipulate existing wheat, wheat grows on the ste[]m and it heads out and there's a bunch of seed from the head. Well, any time you manipulate that, they'll be evidence of wheat heads. You know, seed in the head. All the

made two separate plots in the disced ground, one of which they marked with a stick "stob" and one of which they marked with a shotgun shell, and from which they extracted every piece of wheat which they labeled and placed in zip lock bags. (*Id*. at 23-26; *see also* Government's Exhibit 20 (wheat removed from the two plots)) The officers then took photographs of the plots and wheat seed. (T.T. 28-31; *see also* Government's Exhibits 2-7)[2]

       3.      Nelson returned to the field on the night of September 26, 2008; finding his two plots devoid of wheat seed, he exited the field. (T.T. 32) The following day, Nelson went to within earshot of the field but did not hear anyone shooting so he left. (*Id*. at 32-33) Nelson did not return to this field until five days later, on October 2, 2008. (*See id*. at 33) He first went to the field that afternoon and observed a man in a pickup truck keeping watch over the field and appearing to look "for how birds were flying." (*Id*.) After the man left, Nelson walked into the field and discovered fresh wheat seed in the two plots he marked on September 23, 2008. (*Id*. at 34) Nelson returned to the field later that night to take photographs of the two plots, same reflecting fresh

---

seed just doesn't actually come out of . . . what it's in and end up on top of your disked area. Most of it's going to be disked under, because you're actually disking that."))

    [2]      These photographs are totally devoid of wheat seed; however, there is evidence of wheat stem debris and fresh sprouts of wheat. (*See id*.)

wheat seed. (*Id*. at 34-37; *see also* Government's Exhibits 8-13) After taking those pictures, Nelson contacted Thomas D. Grace, Jr. (*id*. at 37), a special agent with the United States Fish and Wildlife Service (*id*. at 74); Nelson informed Grace of the situation he had and the two men agreed to meet the following day at noon (*see id*. at 75).

   4. In the early afternoon of October 3, 2008, Nelson and Grace found a hidden location near the field , where they could observe the field, and waited to see if anyone showed up to hunt over the field during the last week of dove season. (*Id.* at 38) At approximately 2:00 p.m. Collins showed up at the field on a tractor with a disk attached to it and started to turn up the soil. (*Id*. at 39 & 76; *see also id*. at 80 (field was turned under just prior to the hunt))[3] After discing the soil, Collins moved some hay bales around the field and then made three or four trips on an all-terrain vehicle ("ATV") to move into the field eleven hunters and two cameramen. (*See id*. at 39-40 & 77) The hunt started; Nelson and Grace decided to stay hidden and watch for violations of the bag limit (*id*. at 41). Approximately an hour after the hunt began, one of the hunters saw the two men as he was retrieving a crippled bird (*id*. at 41-42 & 78); therefore, Nelson and Grace revealed themselves to the hunters and

---

[3] Photographs were taken of Collins discing the field. (T.T. 49; *see also* Government's Exhibits 14 & 15)

shut down the hunt (*id.*).

        5.        When Nelson and Grace approached Collins, Grace noticed a couple of untagged mourning doves in the open glove box of the defendant's ATV. (*See id.* at 52, 78 & 82) Collins informed the officers that the birds belonged to Thomas Knapp (*id.*)[4] and that he had picked up birds for other hunters as well and worked his way around the field delivering the birds to the rightful hunter (Doc. 12, at 10; *see also id.* at 3 ("Collins never left the field with the birds, because he took the birds to the hunters as he rode by their stand.");[5] *see* T.T. 64-65 (Nelson's testimony that Collins never left the hunting area)).[6] With respect to the field, the officers testified that Collins told

---

[4] These are the totality of events which led Grace to believe that Collins was in possession of someone else's untagged birds. (T.T. 99) William T. Copeland, Jr., an attorney from Demopolis, Alabama, testified that he has hunted over fields prepared by Collins and that he is entirely comfortable with Collins picking up downed birds and taking those birds to the hunters who shot them. (T.T. 66-68)

[5] During the trial of this case, the recording equipment malfunctioned and, therefore, not all testimony was transcribed. Accordingly, the Court has relied on its notes and memory of the testimony which was not transcribed, aided by the recollections of the attorneys involved.

[6] Grace testified that it would not be illegal for an individual to pick up a hunter's bird and then circle the field in an ATV to deliver the bird to that hunter. (T.T. 91; *but cf.* T.T. 92-93 ("Q. . . . [I]f that hunter shoots a bird down, he [Collins] takes his dog and finds that bird and makes a lap around the field and brings it to the hunter, that's not illegal, is it? A. He's taking custody of somebody else's birds.")) According to Grace, the significance of taking possession of untagged birds belonging to a particular hunter is that "it relieves them of their possession for that hunt, the bag limit." (T.T. 94)

6

them that he had previously planted wheat in the field which he "scratched" three times and cleaned up and then the week before the hunt he top sowed wheat on the ground. (T.T. 45 & 79-80) Grace testified that when he told Collins that the field had been monitored for the last two weeks, the defendant's expression changed and he basically told the officers that if there was any problem with the field he was the responsible party. (*See id.* at 80 ("[H]e made the statement, you know, if I told everybody what to do and they did what I said would . . . they get in trouble. And I said, no, of course."); Doc. 12, at 10 ("When the officers approached the field Collins repeat[edly] told the officers that he had only top sewn (sic) the wheat on one occasion, however, for the protection of the people there he asked that any problem with the field be his responsibility."))

      6.      Collins testified that with respect to the field in question on Leonard Moseley's place in Thomaston, Alabama,[7] he manipulated the existing agriculturally grown and mature wheat by first spraying the wheat (prior to September 16, 2008) with Round-Up and killing all refuse, grass and weeds and then continued the manipulation mechanically by utilizing a special mower to cut and blow the wheat (on more than one occasion), same causing

---

[7]      Moseley leased the hunting and cattle rights to Collins. (T.T. 56)

the dry and brittle stubble and wheat heads to disintegrate into small particles and leaving only wheat seed (and limited rubble) on the ground. (Doc. 12, at 2 & 9-10)[8] The defendant then applied wheat seed to the ground approximately one week prior to the hunt in accordance with planting practices promoted by the Alabama Cooperative Extension System. (*See id.* at 10) Collins testified that on the day of the hunt he disced the field to turn under wheat that had started to sprout in order to alleviate any question for a hunter who did not understand that he had agriculturally manipulated existing wheat. (*Id.*)

      7. On October 24, 2008, Nelson and Grace returned to the field, with Refuge Officer Kenny Finch, to take more photographs in order to document the size of the wheat. (T.T. 52-55 & 82-85; *see also* Government Exhibits 16-19) Exhibit 16 reflects a wheat stem of approximately one inch and Exhibit 17 reflects a wheat stem of approximately 5 to 6 inches. (*See* T.T. 54 & 82-83 & the Exhibits) According to the officers, the size difference is significant and establishes that there were two applications of wheat seed. (*See* T.T. 53 & 84) Grace admitted that during a particularly dry period wheat may

---

[8] Russell Gibbs, the manager of Central Alabama Farmers Cooperative (T.T. 100), testified that he had observed Collins manipulate grown wheat in this manner (*see* Doc. 12, at 7-8).

come up quicker and better in the part of a field that has more moisture. (T.T. 96)[9] Moreover, Russell Gibbs testified that the different stages of growth in wheat would not evidence different applications of wheat because once the field is disced, the wheat would come up together if the moisture was the same (Doc. 12, at 3). Instead, the differences in growth stages would be attributable to different levels of moisture. (*Id*.)

8.      Nelson testified on cross-examination that it is legal in the State of Alabama to manipulate agriculturally-grown crops for the purpose of dove hunting. (T.T. 57) Moreover, it is legal to top sow wheat seed on the ground for the purpose of hunting dove if the field is situated in Alabama's Southern Zone and the wheat seed is sown after September 15. (*See id*.) Officer Nelson admitted that he could not state with certainty how the wheat seed that was on the ground during his first visit to the field had gotten there since he was not an eyewitness to such action. (*See id*. at 61-62)

9.      On December 2, 2008, Collins was issued two violation notices, one for receiving or having in his custody untagged migratory game birds belonging to another in violation of 16 U.S.C. § 703 and 50 C.F.R. § 20.37, and, the second, for aiding and abetting violations of 16 U.S.C. § 703, The

---

[9]      Nelson testified that drought-like conditions existed during September and October of 2008. (*Id*. at 62)

Migratory Bird Treaty Act, and 50 C.F.R. § 20.21(i), the Baiting Regulation, in violation of 18 U.S.C. § 2 and 50 C.F.R. § 20.21(i). (*See* Doc. 2)

## CONCLUSIONS OF LAW

1.      The Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq*., makes it unlawful for any person "at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess . . . any migratory bird[.]" 16 U.S.C. § 703(a). Under the Act, the Secretary of the Interior is authorized to promulgate regulations implementing the foregoing prohibition. *See* 16 U.S.C. § 704(a). The pertinent regulation at issue here is the baiting regulation which provides, in relevant part, as follows:

> No persons shall take migratory game birds:
>
> . . .
>
> (i) By the aid of baiting, or on or over any baited area, where a person knows or reasonably should know that the area is or has been baited. However, nothing in this paragraph prohibits:
>
> . . .
>
> (2) The taking of any migratory game bird, except waterfowl, coots and cranes, on or over lands or areas that are not otherwise baited areas, and where grain or other feed has been distributed or scattered solely as the result of manipulation of an agricultural crop or other feed on the land where grown, or solely as the result of a normal agricultural operation.

50 C.F.R. § 20.21(i)(2) (2008); *see* 16 U.S.C. § 704(b)(1) & (2) ("It shall be unlawful for any person to . . . take any migratory game bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area; or [] place or direct the placement of bait on or adjacent to an area for the purpose of causing, inducing, or allowing any person to take or attempt to take any migratory game bird by the aid of baiting on or over the baited area."). "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a); *see also* 18 U.S.C. § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

  2. In light of the foregoing, it is clear that in order for Collins to be found guilty of aiding and abetting violations of 16 U.S.C. § 703 and 50 C.F.R. § 20.21(i), the undersigned must find that the government has proven beyond a reasonable doubt that: (1) the field "was a 'baited area;'" and (2) that the defendant aided and abetted the hunters hunting that field on October 3, 2008 "in the taking or attempted taking of migratory birds either by the aid of bait or over a baited area." *United States v. Dize*, 839 F.Supp. 1170, 1178 (D.Md.

1993), *judgment aff'd*, 851 F.Supp. 708 (D.Md. 1994), *aff'd*, 51 F.3d 269 (4th Cir. 1995); *see also Strassweg, supra,* 337 F.Supp.2d at 964 ("There is no dispute that Messrs. Strassweg and Krohn hunted over Field 2 on September 1, 2002. Nor is there any dispute that the doves they hunted and killed on September 1, 2002, are 'migratory game birds' protected by the Migratory Bird Treaty Act. Thus, the undersigned must determine whether the United States has satisfied its burden as to the remaining elements of the charge against Messrs. Strassweg and Krohn. More specifically, has the United States proven beyond a reasonable doubt that Messrs. Strassweg and Krohn took the doves by the aid of baiting or on or over a baited area? Secondly, has the United States proven beyond a reasonable doubt that Messrs. Strassweg and Krohn knew or reasonably should have known that the area was a baited area? If the United States satisfies its burden as to the charge against Messrs. Strassweg and Krohn, then it has also satisfied the first element of the aiding and abetting charge against Mr. Romain. The undersigned then must determine whether the United States has satisfied its burden as to the remaining elements of the charge against Mr. Romain. More specifically, has the United States proven beyond a reasonable doubt that Mr. Romain helped Messrs. Strassweg and Krohn to commit the crime and that he intended to help them commit the

crime.") (internal citations omitted); *see United States v. King*, 1992 WL 73358, \*2 (E.D. La. 1992) ("To be convicted under this statute, the government must prove *either* that the defendant aided or abetted in the crime *or* that he actually committed the crime.").

   3. There is no dispute in this case but that on October 3, 2008, Collins hosted a dove hunt over a Thomaston, Alabama field he leased from Leonard Moseley. Moreover, there is no dispute but that mourning doves are "migratory game birds" protected by the Migratory Bird Treaty Act. *Strassweg, supra,* 337 F.Supp.2d at 965; *see also United States v. Marston*, 175 F.Supp.2d 1349, 1359 n.16 (S.D. Ala. 2001) ("Mourning doves are included in the dove species of migratory birds."); 50 C.F.R. § 10.13 (list of migratory birds includes the mourning dove, *Zenaida macaoura*). Accordingly, the undersigned considers whether the government has satisfied the requisite burden of proof with respect to the remaining elements of the violation, namely whether the United States has proven beyond a reasonable doubt both that the field in question was a baited area and that the defendant aided and abetted the hunters hunting that field on October 3, 2008 in the taking of birds over a baited area. If the evidence offered at trial fails to satisfy either remaining element, it is clear that this Court must find Collins not guilty of the

aiding and abetting charge.

    4.    This government's case with respect to this charge stands and falls on the issue of whether the field in Thomaston, Alabama which Collins leased from Leonard Moseley and upon which a dove hunt occurred on October 3, 2008 was a baited area. In considering this issue, the undersigned is guided by Alabama Regulation 220-2-.114, Normal Agricultural Planting and Hunting of Dove:

> 1.    Top sowing of wheat is a recommended planting practice for establishing a cover crop in low-input management systems. This planting practice requires a well-prepared seedbed. A well prepared seedbed involves adequate tilling of the soil so that when the seeds are planted there will be good soil-to-seed contact and the soil is not excessively hard (i.e., it can easily be penetrated by the developing root of the germinating small grain seed). . . .
>
> 2.    It is recommended that small grain other than as outlined above be planted into a prepared seedbed by broadcasting or drilling and a bona fide attempt be made to cover seed by cultipacking, discing, raking, etc. Some incidental seed may remain on the surface following a bona fide covering attempt. All small grain planting should adhere to planting dates recommended in printed tables furnished by the Alabama Cooperative Extension System. The earliest planting dates for wheat are included by zone in this regulation.[10] Recommended seeding rate for small grain is no more than 200 lbs./acre. Seeds should be uniformly distributed.

---

[10]    The earliest planting date for wheat in the South planting zone, including Marengo County, where the field in question is located, is September 15.

14

. . .

> It will be illegal to hunt over wheat planted before these dates or outside of dates recommended in printed tables furnished by the Alabama Cooperative Extension System. Any small grain planting that does not conform with these guidelines shall be considered bait. ***Multiple seedings are not permitted under this regulation***.
>
> It is illegal to hunt dove on, over, or near any baited area until all bait is completely gone for ten days.

ALABAMA REGULATIONS GAME, FISH, AND FUR BEARING ANIMALS, § 220-2-.114 (2004-2005) (emphasis supplied; footnote added). In addition, as previously indicated, the Code of Federal Regulations provides that it shall not be illegal to take any migratory game bird on or over lands or areas that are not otherwise baited areas and where grain has been distributed or scattered solely as the result of manipulation of an agricultural crop. 50 C.F.R. § 20.21(i)(2) (2008); *see also* MANAGEMENT AND HUNTING OF MOURNING DOVES IN ALABAMA (Alabama Department of Conservation and Natural Resources, Wildlife and Freshwater Fisheries Division, July 2004) ("Standing crops may also be manipulated by any method to attract doves such as mowing, discing or burning so long as it is not harvested and then redistributed on the field."). Finally, it is clear that "[w]hether an area is a 'baited area' is a factual determination." *Falk v. United States ex rel.*

15

*Department of the Interior*, 452 F.3d 951, 955 (8th Cir. 2006).

      5.      When the pertinent regulations are considered in light of the evidence in this case, the undersigned simply cannot find that the United States has proven beyond a reasonable doubt that the field in question was a baited area. This is because the wheat seed that Officer Nelson observed and picked up on September 22 and 23, 2008 (and later observed on September 26, 2008) was not placed there by Collins as part of a seeding or top sowing of wheat; instead, the wheat seed that the wildlife officers saw on those dates got there as a result of Collins' manipulation of the existing wheat crop. Therefore, the wheat seed that Collins scattered and applied to the Thomaston, Alabama field between September 26, 2008 and October 2, 2008 did not constitute his second seeding/sowing of wheat. Rather, this application of wheat seed constituted his first and only top sowing/seeding of wheat, a normal agricultural practice for establishing a cover crop in low-input management systems as recognized by the Alabama Cooperative Extension System. Thus, because there were not multiple seedings, Collins' dove field in Thomaston, Alabama was not a baited area. Because the field was not a baited area, the undersigned finds the defendant **NOT GUILTY** of aiding and abetting violations of 16 U.S.C. § 703 and 50 C.F.R. § 20.21(i).

6. 50 C.F.R. § 20.37 provides that "[n]o person shall receive or have in custody any migratory game birds belonging to another person unless such birds are tagged as required by § 20.36."[11] The testimony in this case was that Collins, as the host of the dove hunt,[12] assisted the hunters by picking up the birds they killed and carrying those birds to the rightful hunters in his ATV. Even Agent Grace stated at one point during his testimony that it would not be illegal for an individual to pick up a hunter's bird and then circle the field in an ATV to deliver the bird to that hunter. (T.T. 91) There was no evidence presented that Collins ever left the field. When the conservation officers entered the field and stopped the hunt they observed two untagged doves in the glove box of Collins' ATV. The defendant informed the two officers that the doves belonged to one of the hunters, Thomas Knapp. There was no evidence presented that Knapp would have been over the bag limit had Collins been able to deliver those two birds to Knapp.

7. The undersigned does not interpret the language of 50 C.F.R. §§

---

[11] Section 20.36 reads as follows: "No person shall put or leave any migratory game birds at any place (other than at his personal abode), or in the custody of another person for picking, cleaning, processing, shipping, transportation, or storage (including temporary storage), or for the purpose of having taxidermy services performed, unless such birds have a tag attached, signed by the hunter, stating his address, the total number and species of birds, and the date such birds were killed. Migratory game birds being transported in any vehicle as the personal baggage of the possessor shall not be considered as being in storage or temporary storage."

[12] Collins did not actively participate in the hunt by shooting doves.

20.37 and 20.36 to reach and punish actions such as those taken by Collins in this case during the course of a dove hunt. Rather, the undersigned finds that these regulations were meant to reach conduct engaged in after a hunt has been completed. As Agent Grace pointedly testified, the significance of taking possession of untagged birds belonging to a particular hunter is that "it relieves them of their possession for that hunt, the bag limit." (T.T. 94) As aforesaid, there was no evidence presented of a bag limit problem with Knapp and Collins clearly told the officers that the birds belonged to Knapp when they saw them in the glove box of his ATV. Because there was no evidence offered to refute that Knapp shot the birds and that Collins had merely picked up the birds and was en route to deliver them to Knapp, the undersigned finds Collins **NOT GUILTY** of receiving or having in his custody untagged migratory game birds belonging to another person.[13]

## **CONCLUSION**

The Court finds the defendant, Van Collins, III, **NOT GUILTY** of aiding and abetting violations of 16 U.S.C. § 703 and 50 C.F.R. § 20.21(i) and

---

[13] Black's Law Dictionary defines custody as "[t]he care and control of a thing or person for inspection, preservation, or security." BLACK'S LAW DICTIONARY, at 412 (8th ed. 2004). The undersigned finds that the testimony in this case unequivocally establishes that Van Collins was not in custody of the doves in question as that term is commonly used and understood.

**NOT GUILTY** of receiving or having in his custody untagged migratory game birds belonging to another person, as set forth in the violation notices.

**DONE** this the 22nd day of June, 2009.

   s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**